# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2015-CA-00701-COA

**PEGGY THOMAS**                                                          **APPELLANT**

**v.**

**DR. JAMES PURDY**                                                        **APPELLEE**

DATE OF JUDGMENT:               04/06/2015
TRIAL JUDGE:                    HON. LESTER F. WILLIAMSON JR.
COURT FROM WHICH APPEALED:      LAUDERDALE COUNTY CIRCUIT COURT
ATTORNEYS FOR APPELLANT:        DAVID EARL ROZIER JR.
                                J. KEITH PEARSON
                                JENESSA JO CARTER HICKS
                                SARAH LYNN DICKEY
ATTORNEYS FOR APPELLEE:         GAYE NELL LOTT CURRIE
                                DENNIS JASON CHILDRESS
NATURE OF THE CASE:             CIVIL - MEDICAL MALPRACTICE
TRIAL COURT DISPOSITION:        JUDGMENT IN FAVOR OF APPELLEE
DISPOSITION:                    AFFIRMED – 04/04/2017
MOTION FOR REHEARING FILED:
MANDATE ISSUED:

### BEFORE IRVING, P.J., FAIR AND WILSON, JJ.

### IRVING, P.J., FOR THE COURT:

¶1.     Peggy Thomas brought a medical-malpractice action against Dr. James Purdy. A jury found in favor of Dr. Purdy. Thomas appeals, asserting three issues: (1) whether the trial court erred in refusing to redact certain language contained in the medical records of Thomas's treating physicians; (2) whether the trial court erred in allowing one of Dr. Purdy's expert witnesses to testify; and (3) whether the trial court erred in denying Thomas's motion for a continuance of the trial.

¶2.     We find no error in the trial court's rulings and, accordingly, affirm.

FACTS

¶3.    Thomas underwent a routine surgery for repair of a prolapsed bladder on January 15, 2010, at Rush Hospital in Meridian, Mississippi. Dr. Purdy, a gynecological surgeon, performed the surgery, which involved an anterior cystocele repair procedure using a Xenoform graft insertion. This type of procedure required Thomas's body to be placed in a particular position—referred to as a "lithotomy position"—during surgery, where she was to lie on her back with her thighs pressed apart. The procedure itself was uneventful; however, Thomas experienced post-surgical complications of sciatic nerve pain and foot drop.[1] Thomas claims that her nerve pain resulted from a stitch injury—i.e., that Dr. Purdy had injured her sciatic nerve as he was stitching up her bladder upon completion of the procedure. Dr. Purdy maintained that he examined Thomas after surgery and had at that time concluded that her sciatic nerve injury was not the result of a stitch. Dr. Purdy consulted Dr. Rafique Ahmad, a neurologist, and Dr. David Malloy, a neurosurgeon, regarding Thomas's nerve pain. Dr. Purdy ended his care of Thomas after consulting with these two physicians.

¶4.    Thomas received physical examinations from Dr. Ahmad in 2010 and on several occasions thereafter, during which Dr. Ahmad made note of his opinion that Thomas had suffered a "[r]ight sciatic nerve axonal injury with foot drop," and that Thomas's "[r]ight foot drop [was] probably secondary to L5, S1 lumbar radiculopathy. Other possibility could be

---

[1] "Foot drop" is defined as "an extended position of the foot caused by paralysis of the flexor muscles of the leg[.]" *Foot Drop*, Merriam-Webster.com, https://merriam-webster.com/medical/foot%20drop (last visited Sept. 12, 2016).

common peroneal nerve palsy." Thomas additionally saw Dr. Malloy, who opined in his notes that Thomas had suffered a "[s]ciatic nerve injury, tibial and peroncal nerve," with "[m]ultiple levels of degenerative change throughout the lumbar spine. Nothing surgical." Dr. Malloy further wrote that while he found evidence of a degenerative condition in Thomas's spine, "[t]his lady has suffered a sciatic stretch palsy . . . . Her symptoms are not arising from the mild degenerative changes noted in the lumbar spine MRI." Dr. Malloy wrote that he informed Thomas that "her injury [was] probably from a stretch injury to the nerve."

¶5. In February 2012, Thomas brought a medical-malpractice action against Dr. Purdy, Rush Hospital, and various Rush Hospital personnel, alleging that Dr. Purdy placed a stitch in or near Thomas's sciatic nerve during surgery and that he failed to take subsequent remedial measures to alleviate the injury. Further, Thomas alleged that Rush Hospital personnel failed to properly place Thomas in the surgical lithotomy position, causing the stretch injury to Thomas's sciatic nerve. The trial court granted summary judgment in favor of Rush Hospital and its personnel in December 2013. Thomas's claim against Dr. Purdy was set to go to trial on March 30, 2015.

¶6. On January 3, 2014, the circuit court issued an order limiting the testimony of Dr. Ahmad and Dr. Malloy to that of treating physicians under the Mississippi Rules of Evidence, and held that they could "testify as to their treatment of [Thomas] and their impressions of her injury but . . . not . . . as to the applicable standard of care or give an

3

opinion as to any breach thereof."

¶7.    On March 16, 2015, Thomas filed a motion to exclude the opinions of Dr. Ahmad and Dr. Malloy, arguing that such exceeded the scope of the court's January 3, 2014 order to only allow Dr. Ahmad and Dr. Malloy to testify as treating physicians.[2]  Thomas also requested remedies "including but not limited to an order specifying the redaction of the treating physicians' causation opinions from the medical records in this matter." Thomas furthermore asserted that "because Dr. [James Martin] Tucker's supplemental opinions as to causation are solely based on the medical causation opinions of plaintiff's treating physicians, Dr. Tucker must not be allowed to present such testimony to the jury, as it does not qualify as an expert opinion."  Thomas expounded upon this argument in a separate motion[3] also filed on March 16, 2015, wherein she argued that Dr. Purdy wrongfully waited until after the court granted summary judgment in favor of Rush Hospital to reveal the fact that Dr. Tucker believed that a stretch was the cause of Thomas's injury.  Further, Thomas asserted that Dr. Purdy had conveyed exactly the opposite in his first two designations of Dr. Tucker as an expert—that he did not believe a stretch was a cause of Thomas's injury or that he had no opinion at all.  Thomas argued that Dr. Tucker's revised opinion that Thomas suffered from a stretch injury was based solely on the causation opinions of Dr. Ahmad and Dr. Malloy, and

[2] Thomas conflates the terms "treating physician" and "lay witness."  The court's January 3, 2014 order provided that Dr. Ahmad and Dr. Malloy could testify in their capacities as treating physicians, which is distinct from that of lay witnesses.

[3] Of note is the fact that Thomas had previously filed a motion to strike Dr. Tucker's testimony, which was denied on November 14, 2014.

4

that to base his opinion on such would be improper. Finally, Thomas argued that Dr. Tucker lacked the training and expertise regarding the subject in question. On March 18, 2015, the trial court denied Thomas's motion in limine regarding Dr. Tucker's testimony, as well as Thomas's motion in limine regarding the medical records and potential testimony of Dr. Ahmad and Dr. Malloy.

¶8. On March 27, 2015, Thomas moved for a continuance of the trial due to the unavailability of a purportedly material expert witness, Dr. David Preston, which was denied. Immediately prior to trial on March 30, 2015, Thomas moved to redact the word "stretch" in nine instances throughout the medical opinions of Dr. Ahmad and Dr. Malloy on the basis that Dr. Ahmad and Dr. Malloy were merely "lay treating physicians" who were not able to testify about causation. The trial court denied this motion as well, and trial commenced. On April 2, 2015, the jury returned a verdict in favor of Dr. Purdy. Thomas subsequently filed a motion for a new trial or, in the alternative, a judgment notwithstanding the verdict, which the trial court denied on April 21, 2015. Thomas timely filed this appeal on May 1, 2015.

## DISCUSSION

I. *Whether the trial court erred in admitting certain expert causation opinions contained in the medical records of Thomas's treating physicians*

¶9. Thomas argues that the trial court erred when it admitted into evidence the medical records of Dr. Ahmad and Dr. Malloy, but denied Thomas's request to redact certain words from those medical records. Specifically, Thomas sought to have the word "stretch"

5

redacted in nine instances throughout the records, arguing that this word indicated Dr. Ahmad and Dr. Malloy's opinions as to the causation of Thomas's injury, and causation is outside the scope of a "lay treating physician." Conversely, Dr. Purdy argues that the trial court did not abuse its discretion in refusing to redact this verbiage, because Dr. Ahmad and Dr. Malloy were capable of testifying in their capacity as treating physicians as to how they examined Thomas, what they found, and their ultimate diagnoses of her condition.

¶10. "The standard of review for a trial court's decision either to admit or exclude evidence is abuse of discretion." *Burnwatt v. Ear, Nose & Throat Consultants of N. Miss.*, 47 So. 3d 109, 114 (¶17) (Miss. 2010). "Unless a substantial right of a party is adversely affected, . . . . appellate courts will not reverse a ruling to admit or exclude evidence." *Id*. Rule 701 of the Mississippi Rules of Evidence provides:

> If a witness is not testifying as an expert, testimony in the form of an opinion is limited to one that is: (a) rationally based on the witness's perception; (b) helpful to clearly understanding the witness's testimony or to determining a fact in issue; and (c) not based on scientific, technical, or other specialized knowledge within the scope of Rule 702.

In contrast, Rule 702 of the Mississippi Rules of Evidence provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.

Regardless, "[a] physician can testify without being accepted as an expert regarding: (1) 'the

6

facts and circumstances surrounding the care and treatment of the patient'; (2) 'what his records about the patient reveal'; and (3) 'what conditions the patient was suffering from if the opinion was acquired during the care and treatment of the patient.'" *Chaupette v. State*, 136 So. 3d 1041, 1046 (¶8) (Miss. 2014) (quoting *Griffin v. McKenney*, 877 So. 2d 425, 439-40 (¶50) (Miss. Ct. App. 2003)) (internal citation omitted). "However, a physician cannot testify about the significance of a patient's condition or industry standards without first being accepted as an expert." *Id*. (internal citations omitted).

¶11.    Prior to trial, the parties agreed to the admission of Dr. Ahmad and Dr. Malloy's medical records regarding their treatment of Thomas. As stated, on the day of trial, Thomas sought to have portions of these records redacted, arguing that the disputed verbiage went to the causation of Thomas's injury, which transcended the scope of appropriate testimony for "lay treating physicians." In support of her argument, Thomas cited *Chaupette*, 136 So. 3d at 1046 (¶10), in which the Mississippi Supreme Court held that the trial court erred in allowing a sexual abuse victim's treating physician to testify as a lay witness under Rule 701, when she should have testified as an expert witness under Rule 702. The court stated, "Clearly, [the physician's] diagnosis was an opinion, and, as she stated, it was based on the patient history taken, as well as [her] physical examination of [the victim]. Her opinion no doubt was based on her specialized knowledge, which can be presented only under the strictures of Rule 702." *Chaupette*, 136 So. 3d at 1046 (¶10). In response, Dr. Purdy argued that a treating physician "can talk about how he examined the patient, what he found[,] and

what his diagnosis of the patient is. What they can't talk about is how their diagnosis impacts the standard of care in this case or give away opinions as to any alleged negligence."

¶12. The trial judge considered both arguments and ultimately refused to redact the disputed verbiage, holding that the two physicians "made conclusions based on their observations about the nature of the problem and how to treat it." The record reflects that after speculating that Thomas had sustained a nerve injury, Dr. Purdy consulted with these two physicians, a neurologist and a neurosurgeon. The record further reflects that Thomas underwent physical examinations by both physicians. The trial judge allowed the entire exhibit, without redaction, reasoning:

> [Dr. Ahmad and Dr. Malloy] are not giving opinions as to whether Dr. Purdy did anything right or wrong. They are testifying about what they observed and how they classified the condition that they were dealing with with [Thomas]. I think they can do that.

¶13. We agree with the trial court's ruling that the medical records of Dr. Ahmad and Dr. Malloy were appropriate under the Mississippi Rules of Evidence as testimony by treating physicians, and that no redactions were required. The use of the word "stretch" does not speak to the causation of Thomas's injury; rather, it is descriptive of the doctors' opinions, stemming from their personal observations and analyses, as to what type of injury Thomas sustained. Nor does use of the word "stretch" indicate certain significance of the condition, or speak to any standard of care that Dr. Purdy may have owed to Thomas, post-surgery. Thus, we find no merit to this issue.

      II.     *Whether the trial court erred in allowing Dr. Tucker to testify on behalf*

8

*of Dr. Purdy*

¶14.    Thomas argues that the trial court erred in allowing Dr. Tucker to testify because Dr. Tucker, a board-certified OBGYN, was not qualified to testify as to neurological evidence, which was inherently invoked by discussion of Thomas's sciatic nerve injury.  In response, Dr. Purdy argues that the trial court did not err because Dr. Tucker's testimony was not neurological in nature, and was both relevant and reliable pursuant to *Daubert v. Merrill Dow Pharmaceuticals, Inc*., 509 U.S. 579 (1993).

¶15.    "The standard of review for a trial court's decision either to admit or exclude evidence is abuse of discretion." *Burnwatt*, 47 So. 3d at 114 (¶17).  "Furthermore, the admission of expert testimony is within the sound discretion of the trial judge." *Miss. Transp. Comm'n v. McLemore*, 863 So. 2d 31, 43 (¶4) (Miss. 2003).  Rule 702 of the Mississippi Rules of Evidence gives the trial judge "discretionary authority, reviewable for abuse, to determine reliability in light of the particular facts and circumstances of the particular case." *Id*. at 39 (¶24) (quoting *Kumho Tire Co. v. Carmichael*, 562 U.S. 137, 158 (1999)).  "Therefore, the decision of a trial judge [regarding expert testimony] will stand 'unless we conclude that the discretion was arbitrary and clearly erroneous, amounting to an abuse of discretion.'" *Id*. (quoting *Puckett v. State*, 737 So. 2d 332, 342 (¶57) (Miss. 1999)).

¶16.    Rule 702 of the Mississippi Rules of Evidence is identical to Rule 702 of the Federal Rules of Evidence; the United States Supreme Court in *Daubert*, 509 U.S. at 592-94, set forth an analytical framework for determining whether expert testimony should be admitted

under this rule. In accordance with this framework, expert testimony should only be admitted if (1) the testimony is relevant—in other words, the testimony will assist the trier of fact in understanding or deciding a fact in issue—and (2) the testimony is reliable, which involves considering the following non-exhaustive factors:

> [W]hether the theory or technique can be and has been tested; whether it has been subjected to peer review and publication; whether, in respect to a particular technique, there is a high known or potential rate of error; whether there are standards controlling the technique's operation; and whether the theory or technique enjoys general acceptance within a relevant scientific community.

*McLemore*, 863 So. 2d at 36-37 (¶13) (quoting *Daubert*, 509 U.S. at 592-94). Furthermore, the witness must be qualified to testify by virtue of his knowledge, skill, experience, or education. *Id*. at 39 (¶23).

¶17. The Mississippi Supreme Court adopted a modified version of the *Daubert* analysis in *McLemore*. Under this modified analysis, Mississippi courts are to first determine whether the evidence to be offered by the witness is relevant. *Id*. Rule 401 of the Mississippi Rules of Evidence defines "relevant evidence" as evidence that "has any tendency to make a fact more or less probable than it would be without the evidence." "If the proffered evidence has any probative value at all, Rule 401 favors its admission." *McLemore*, 863 So. 2d at 40 (¶27). After ascertaining its relevance, Mississippi courts will use the reliability factors set forth in *Daubert* "for guidance" in determining whether the evidence should be admitted; appellate courts are to leave "the determination of which reliability factors are applicable in particular cases to the sound discretion of our learned trial judges." *Id*. at (¶28).

10

¶18.     Here, the trial court found that Dr. Tucker's testimony was both relevant and reliable under Mississippi's application of the *Daubert* standard. Further, the judge found that Dr. Tucker was able to testify as to "how a GYN surgeon dealing with this particular problem -- what they would have considered as the causes, the proper method of treatment[,] and how and when to do it." Dr. Tucker is a board-certified OBGYN surgeon and medical professor. He has had over twenty-five years of medical experience. He personally reviewed Thomas's medical records and formulated his opinion as to the cause of her post-surgical injury based on those records. The trial court was well within its discretion in allowing Dr. Tucker's expert testimony. Accordingly, we find this issue has no merit.[4]

> III.     *Whether the trial court erred in denying Thomas's motion for a continuance of trial due to the unavailability of a material expert witness*

¶19.     Thomas argues that the trial court erred when it denied her motion for a continuance of the trial due to the unavailability of a material witness, Dr. Preston, who purportedly stopped corresponding or cooperating with Thomas during the week prior to trial when he was to be deposed. Dr. Purdy counters that there was no manifest injustice in denying the motion for a continuance, because Thomas had months, if not years, to depose Dr. Preston regarding whether Thomas had suffered a stretch injury. Further, Dr. Purdy asserts that Dr.

---

[4] In arguing that the trial court did not err in allowing Dr. Tucker's testimony, Dr. Purdy also asserts that it was actually one of Thomas's experts, Dr. David Billue, whose testimony should not have been admitted. Dr. Tucker and Dr. Billue presented directly contrasting opinions at trial, regarding the placement of Thomas's sciatic nerve. Since Dr. Purdy did not file a cross-appeal, we decline to address this issue.

Preston was not a material witness.

¶20.    "Under this Court's standard of review[,] the granting of a continuance is largely within the sound discretion of the trial court, and a judgment will not be reversed because the continuance is refused unless there has been an abuse of sound discretion." *Cleveland v. State*, 820 So. 2d 37, 39 (¶11) (Miss. Ct. App. 2002).  Where a litigant "had ample time to locate a medical expert to assist with her claim," an appellate court will not reverse a trial court's refusal of a continuance on the basis that such a medical expert was unavailable. *Stallworth v. Sanford*, 921 So. 2d 340, 343 (¶11) (Miss. 2006).

¶21.    On the last business day before trial, Thomas moved for a continuance based on the fact that Dr. Preston suddenly ceased all communication with Thomas's counsel despite a previous willingness to testify in a deposition.  Thomas argued that Dr. Preston was a resident of Ohio, and that Thomas was unable to issue letters rogatory in time to secure his presence at trial.  Thomas further argued that in July 2014, after over three years of litigation and two continuances, Dr. Purdy indicated for the first time that his expert witness, Dr. Tucker, would testify as to Thomas's injury being caused by a stretch, despite the fact that he had previously opined that Thomas's injury was not caused by such.  Thomas asserted that in light of Dr. Tucker's revised testimony, she would be prejudiced if she were not able to present Dr. Preston's testimony that he believed Thomas's injury was not caused by a stretch. Thomas also argued that Dr. Purdy was granted two prior continuances that were made days in advance of trial, and that she was therefore entitled to a continuance as well.

12

¶22.    In response, Dr. Purdy argued that Thomas had plenty of opportunity over the past few years to depose Dr. Preston, and that Dr. Tucker did not change his opinion as radically as Thomas alleges.    Dr. Purdy argued that the language of Dr. Tucker's original expert designation indicates that Dr. Tucker was considering a stretch as a potential source of Thomas's injury.    Further, Dr. Purdy presented evidence that Thomas asked Dr. Tucker questions regarding a potential stretch injury during Thomas's deposition of Dr. Tucker.  Additionally, Dr. Purdy maintained that Dr. Preston was not a material witness, as he did not have firsthand knowledge as to Thomas's injury.    Finally, Dr. Purdy argued that Dr. Preston was not even designated as an expert by Thomas; rather, he was designated by Rush Hospital, which had since been dismissed as a defendant in this matter.    Thus, Thomas was seeking to essentially designate a new expert and obtain expert testimony.

¶23.    The trial court denied Thomas's motion, finding that Thomas had had ample time over the course of the litigation—three years at the time of trial—to depose witnesses.    The judge stated, "I don't think there's anything new about the fact that there's been a stretch possibility of the cause of the Plaintiff's problems opined by various different experts from the very first time experts were consulted."    The judge further remarked that Thomas had been put on notice of the possibility that Dr. Purdy would argue that Thomas's injury was a stretch injury; as such, "these issues ha[d] been out there for everybody to deal with," and this argument was not a surprise for Thomas.    When Thomas reiterated her argument that Dr. Tucker had changed his opinion therefore warranting the opinion of Dr. Preston, the judge held that

13

Thomas should have known it was a possibility that Dr. Purdy would argue that Thomas's injury was a stretch injury.

¶24. We agree with the trial court, and find that it did not abuse its discretion in denying Thomas's motion for a continuance. Just as the trial judge stated, Thomas should have known from early on in the litigation that it was possible that Dr. Purdy would argue that Thomas's injury resulted from a stretch, particularly due to the fact that Dr. Ahmad and Dr. Malloy both provided medical records opining such. Thomas maintains that she did not receive actual notice until July 2014 that Dr. Tucker's definitive opinion was that Thomas's injury was due to a stretch. Regardless, Thomas would have had seven to eight months to obtain a proper medical expert to rebut that opinion. In light of these facts, even accepting that Thomas was severely prejudiced, it cannot be reasonably argued that it was caused by the trial court's denial of her motion. We therefore find that this issue is without merit. Accordingly, we affirm.

¶25. **THE JUDGMENT OF THE CIRCUIT COURT OF LAUDERDALE COUNTY IS AFFIRMED. ALL COSTS OF THIS APPEAL ARE ASSESSED TO THE APPELLANT.**

**LEE, C.J., GRIFFIS, P.J., BARNES, ISHEE, CARLTON, FAIR, WILSON, GREENLEE AND WESTBROOKS, JJ., CONCUR.**